UV-05 4536

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 23 2005   ★

LONG ISLAND OFFICE

—————————————————————— x
SAM WIETSCHNER, derivatively on )
behalf of SYMBOL TECHNOLOGIES INC. )   Civil Action No.:
                                   )   $\cancel{\mathcal{S}\mathcal{I}}$
            Plaintiff,             )
                                   )   **SHAREHOLDER'S**
ROBERT J. CHRENC, SALVATORE        )   **DERIVATIVE COMPLAINT**
IANNUZZI, EDWARD KOZEL,            )
MICHAEL J. LAWRIE, GEORGE          )
SAMENUK, MELVIN YELLIN, WILLIAM )
NUTI, JOHN BRUNO, JAMES M.         )
LANGROCK, PETER M. LIEB and MARK )
GREENQUIST,                        )
                                   )
            Defendants,            )
                                   )
            -and-                  )
                                   )
SYMBOL TECHNOLOGIES, INC.          )
                                   )
            Nominal Defendant.     )
—————————————————————— x

WEXLER, J.

WALL, M.J.

Plaintiff, Sam Wietschner ("Plaintiff"), individually and on behalf of the nominal

Defendant, Symbol Technologies, Inc., by his undersigned attorneys, for his complaint against

defendants, alleges the following based upon personal knowledge as to himself and his own acts,

and information and belief as to all other matters, based upon, inter alia, the investigation

conducted by and through his attorneys, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission ("SEC") filings, wire and press releases published

by and regarding Symbol Technologies ("Symbol" or the "Company") securities analysts' reports

and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTORY STATEMENT OF FACTS

1    Prior to 2004, Symbol had been a business which had undergone a series of major setbacks directly related to the deficiencies of its management and internal control systems. In March of 2003, Robert Asti, one of Symbol's former leading sales executives, pleaded guilty to two federal charges of securities fraud. Less than three months later, Robert Korkuc, the former chief accounting officer of the Company, also pleaded guilty to charges of federal securities law violations. Both of these convictions were directly related to their work with the Company. Indeed, as the Company prepared to release information indicating that it would have to restate more than four years of financial results stemming from internal audit discrepancies and other internal control deficiencies, Symbol's founder and long-time chairman Jerome Swartz and its chief legal officer, Leonard Goldner, both abruptly resigned from the Company in the fall of 2003.

2    In the months following the resignations of Swartz and Goldner, the Company - through its new management team and with the approval of Symbol's Board - issued a series of statements confirming the need for a substantial restatement of Symbol's past financial results and massive revisions in the Company's internal culture and control systems. To this end, in order to curtail the damage from these revelations, the Company's new management team, with the approval of Symbol's Board, continuously reassured the investing public that the Company was systematically improving its internal control procedures and management functions so as to reassert the integrity of the Company's financial and business reporting to the investing public.

2

3    Notwithstanding the repeated assurances of Company management and members of Symbol's Board of Directors that the Company had "implemented various initiatives intended to materially improve its internal controls and procedures, address the systems and personnel issues . . . and help ensure a corporate culture that emphasizes integrity, honesty and accurate financial reporting," Symbol Technologies's internal controls and financial systems continued to be grossly inadequate and did not quell the long-standing pattern of misreporting Symbol's financial condition and immediate prospects.

4    In light of the foregoing, the Director and Officer Defendants named herein, and each of them, caused additional damage to the Company during the period between May of 2005 and August of 2005. In particular, during this period, Symbol was required to: (i) revise financial statements for the first three quarters of 2004; (ii) revise financial projections for much of fiscal 2005 by understating expenses requiring massive charges against earnings; and (iii) acknowledge that its financial and internal controls continued to be defective and inadequate for the purpose of providing any meaningful and accurate financial projections.

5    Based upon these revelations, the Company has once again been damaged by way of its being subjected to additional SEC investigations, its being named in several additional class action lawsuits, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") and a loss in the value of the Company's common stock. Additionally, in the wake of the August of 2005 admissions of continued financial misreporting, the Company's stock and liquidity has continued to suffer severe damage to the extent that there is no indication that the Company can or will either a) prosecute those who had breached their fiduciary duties to the Company and its shareholders for malfeasance during the period between May of 2004 and

3

August of 2005 or b) take necessary remedial action in order to provide meaningful and effective internal controls over the Company's operations.

6    It is on this basis of each and all of the above-referenced conduct, as further detailed herein, that the Plaintiff, on behalf of both himself and the Company, seeks the relief sought herein.

## VENUE AND JURISDICTION

7    At all times herein, the Director and Officer Defendants, in their capacities with the Company, did publicly disseminate the information concerning the earnings and earnings guidance and forecasts relating to the Company via combined press releases as well as through filings with the Securities & Exchange Commission. Moreover, the specific representations regarding the adequacy of the Company's internal control systems were contained in various public pronouncements, the Company's annual 10-K report filed with the Securities & Exchange Commission and were incorporated, by reference, into the Company's Voting Proxy filed with the Securities & Exchange Commission on or about April 11, 2005.

8    Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District. As such, both jurisdiction and venue are proper in this Judicial District pursuant to 15 U.S.C. § 78aa and 28 USC § 1391(b).

9    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and

4

the facilities of the national securities exchange.

## DEFENDANTS' DUTIES TO SYMBOL AND ITS SHAREHOLDERS

10    Because of their membership on the Board, the Audit Committee of the Board, and/or senior executive and managerial positions within the Company, the Directors Defendants and the Officer Defendants owed the Company and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control and direct Symbol in a fair, just, and equitable manner, as well as to act in furtherance of the best interests of Symbol and its stockholders. In addition, while they occupied their directorship and/or senior management positions, the Director Defendants and Officer Defendants owed Symbol the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of the Company, and in the use and preservation of its property and assets.

11    To discharge the aforesaid duties, the Director Defendants were required to exercise reasonable and prudent supervision over management and the policies, practices, controls, and financial affairs of Symbol pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. Specifically, the Director Defendants were required, among other things:

a.    in good faith, to manage, conduct, supervise, and direct the business and affairs of Symbol carefully and prudently, and in accordance with all applicable state and federal laws and the Company's own charter and by-laws;

b.    neither to violate nor intentionally or recklessly to permit any officer, director, or employee of Symbol  to violate applicable federal and state laws, rules and

5

regulations, or any Company rule or regulation;

c.      to ensure Symbol has in place reasonable and effective systems and controls regarding, _inter alia,_ such critical business functions as revenue recognition and the issuance of guidance to the financial markets;

d.      to remain informed as to the status of Symbol's operational and revenue recognition practices and policies, and, upon receipt of notice or information of imprudent, illegal, or unsound practices or suspect conduct, to make immediate and reasonably thorough inquiry in connection therewith, and to take appropriate steps to correct such conditions or practices, and make such disclosures as are necessary to comply with federal and state laws;

e.      to exercise reasonable control and supervision over the Company's public statements to the securities markets by Symbol's officers and employees;

f.      to supervise the preparation, filing, and/or dissemination of any SEC filings, press releases, audits, reports, or other information required by law, to examine and evaluate any audits or other financial information concerning the financial condition and/or expectations of Symbol, and to cause Symbol to obey and comply with, and not violate federal or state securities laws; and

g.      to implement and maintain an adequate system of oversight controls and information systems, such that no officer, director, or employee of the Company would make false statements about Symbol or its financial results to the securities markets, or would be able to or encouraged to violate federal or state laws restricting insider trading.

12      Defendants Iannuzi, Chrenc, Kozel, Samenuk and Yellin, as members of

6

Symbol's Audit Committee, had access to internal corporate documents and had conversations and connections with corporate officers and employees, including internal auditing and financial managers, and received reports and other information in connection with their duties as Audit Committee members.

13      Because of their memberships on the Board, on the Audit Committee of the Board and/or senior most executive and managerial positions with Symbol, each of the Director Defendants and Officer Defendants had access to adverse non-public information about the financial performance and condition of Symbol.

14      In violation of their fiduciary duties, the Director Defendants permitted and/or caused Symbol to conduct its business in an unsafe, imprudent, illegal, and/or dangerous manner by: (i) failing timely or adequately to institute and implement basic systems to oversee and monitor fundamental financial transactions. The Director Defendants' conduct, as detailed more fully herein, involved a knowing, culpable, and/or reckless violation of their obligations as directors of Symbol, an absence of good faith, and a blatant disregard for their duties to the Company and its shareholders which the Director Defendants knew or recklessly disregarded created a substantial risk of economic and reputational injury to the Company.

15      In addition, as a result of their responsibility for, and access to, material non-public information regarding the Company's true financial results and condition, the Director Defendants and the Officer Defendants knew and/or consciously disregarded that the Company had repeatedly issued false and misleading news and financial results to the investing public. Thus, through their actions and/or failures to act, the Director Defendants permitted the Company to conceal from the investment community Symbol's true financial results and condition,

7

therefore permitting the Director Defendants and the Officer Defendants to obtain thousands of dollars in salary, compensation and stock while in dereliction of their various fiduciary obligations.

16     The Director Defendants were responsible for authorizing, or permitting the authorization of the practices which resulted in the: (i) failing to prevent the Company and its officers and directors from committing acts which would, and did, substantially injure the Company, and (ii) allowing the Director Defendants and the Officer Defendants to place their own personal interests above the interests of the Company.

## THE PARTIES

### The Plaintiff

17     At all times alleged herein, Plaintiff has and continues to own common stock in the Company.

### The Nominal Defendants

18     Founded in 1975, Nominal Defendant Symbol Technologies, Inc. ("Symbol" or the "Company") designs, develops, manufactures, and services products and systems used in enterprise mobility solutions, including mobile computing and wireless computer individual and network infrastructures. The Company has concentrated its efforts in the fields of retail, transportation, parcel and postal delivery services, warehousing and distribution, manufacturing, healthcare, hospitality, security, education, and government sectors, selling its products through direct sales forces, original equipment manufacturers, solution providers, authorized resellers, and distributors throughout the world. At all times herein, the Company is headquartered at One Symbol Plaza Holtsville, New York 11742-1300.

8

## Director Defendants

19      First elected to the Company's Board of Directors in December of 2003,

Defendant Robert J. Chrenc ("Chrenc") was appointed non-executive Chairman of the Board of

Directors in early April of 2005. Between 1996 and 2001, Chrenc was affiliated with ACNielsen

- first as an Executive Vice President, then as the Chief Financial Officer and, during 2001, as

Executive Vice President and Chief Administrative Officer. Chrenc has been a member and

Chairman of the Company's Governance and Audit Committees and has been a member of the

Company's Compensation Committee.

20      Defendant Salvatore Iannuzzi ("Iannuzzi") has been the acting as the President

and Chief Executive Officer of Symbol since August of 2005. Having joined the Company's

Board in late 2003, Iannuzzi served as non-executive Chairman of the Board of Directors from

December of 2003 until his replacement in April of 2005 by Chrenc. Thereafter, he has served

as Symbol's Senior Vice President, Chief Administrative and Control Officer. Iannuzzi served

as the Chief Administrative Officer of CIBC World Markets, Inc. from June 2000 to March 2004

and between 1982 and 2000, he held several senior positions at Bankers Trust Company/

Deutsche Bank, including senior control officer and head of corporate compliance.

21      Having served as a director of the Company since March of 2004, Defendant

Edward Kozel ("Kozel") is currently an independent consultant. He served as a managing

director of Integrated Finance, Ltd., a strategic advisory firm, from January of 2004 through

February of 2005 and was the managing member of Open Range Ventures, a venture capital firm,

from November 1999 until December 2003. From 1989 to 1997, Kozel held several positions at

Cisco Systems, Inc., including Senior Vice President Business Development, Chief Technology

9

Officer, and as a member of the Board of Directors from 1996 to 2002. Kozel also serves on the boards of directors of Reuters Group PLC (where he is a member of the Remuneration Committee) and Yahoo!, Inc. (where he serves as Chairman of the Audit Committee). Kozel has served on the Company's Audit Committee since April of 2005. At all times herein, he has been a member of the Company's Compensation Committee.

22     Having been placed on the Company's Board of Directors in June of 2005, defendant Michael J. Lawrie ("Lawrie") most recently served as Chief Executive Officer of Siebel Systems, Inc. from 2004 to April 2005. During a 29 year stint with IBM, Lawrie also served in various management positions (including Senior Vice President and Group Executive) with that company. He is a member of the U.S. Advisory Board of NTT DoCoMo, Inc., and a member of the Board of Trustees of Ohio University.

23     Having first been appointed as a director with the Company in March of 2004, Defendant George Samenuk ("Samenuk") has served as chief executive officer and a director of McAfee, Inc. (formerly Network Associates, Inc.) since January 2001. In April 2001, Samenuk was named Chairman of the Board of McAfee. From January 2000 to January 2001, Samenuk served as President and Chief Executive Officer of TradeOut, Inc., a private online exchange company. From April 1999 to January 2000, he served as General Manager, Americas at IBM Corporation. From August 1996 to April 1999, Mr. Samenuk was General Manager, ASEAN/ South Asia at IBM Corporation. From January 2001 to September 2002, Samenuk served as a director of McAfee.com Corporation, including serving as the chairman of its board from March 2001 until September 2002, when Network Associates purchased the minority interest in McAfee.com Corporation. At all times herein, Samenuk has served on the Company's Audit

10

Committee.

24      Having commenced his service on the Company's Board of Directors in late 2003, Defendant Melvin Yellin ("Yellin") has been the president of Stone Point Corporation since July 2003. Stone Point Corporation concentrates primarily on risk management and corporate governance issues. From 1999 to 2003, Mr. Yellin was of counsel to Skadden Arps Slate Meagher & Flom LLP. Prior to holding that position, Yellin served as Executive Vice President and General Counsel of Bankers Trust Company. In 2002, Yellin served as chairman and president of the New York Metropolitan Chapter of the National Association of Corporate Directors and has been a frequent lecturer for The Conference Board on governance issues. Yellin has served on the Company's Audit Committee since April of 2005 and at all times has been a member of the Chairman Company's Compensation Committee and a member of the Corporate Governance Committee.

25      Defendant William R. Nitti ("Nitti") was appointed President and Chief Operating Executive Officer of Symbol on August 1, 2002 and was appointed President, Chief Executive Officer and director on December 30, 2003 before leaving the Company in August of 2005. Nuti joined Symbol from Cisco Systems, Inc., where he was senior vice president of U.S. Theatre and Worldwide Service Provider Operations, responsible for Cisco's field operations, systems engineering, professional services and marketing for the global service provider arena. In his 10-year career at Cisco, Mr. Nuti served as president of Europe, the Middle East and Africa ("EMEA") operations, president for the Cisco Asia Pacific region and various sales management positions.

26      Unless otherwise indicated, Defendants Nuti, Chrenc, Iannuzzi, Kozel, Lawrie,

11

Samenuk and Yellin are referred to herein as the Director Defendants.

**OFFICERS**

27    Defendant James M. Langrock, ("Langrock"), is a certified public accountant who has been the Vice President--Chief Accounting Officer and Corporate Controller of the Company, effective as of May 13, 2005. Previously serving as the Company's Vice President--Internal Audit, he has led the Registrant's internal audit department since December 2003. Before joining Symbol, Langrock served as Chief Financial Officer at Empress International, Ltd., an importer and wholesale distributor, from May 2002 through November 2003. From August 1991 through April 2002, Langrock held a variety of audit positions at Arthur Andersen LLP, including Senior Manager in the Audit and Business Advisory Practice. Prior to Arthur Andersen, Langrock served in various roles, including Assistant Divisional Controller, Manager in the Financial Services Division of Citibank, N.A., in New York, New York from September 1987 to July 1991. Langrock holds both B.B.A. and M.B.A. degrees. At all times herein, in his capacities with the Company's accounting and control offices, Langrock was responsible for preparing and/or assisting in the preparation of the Company's financial disclosures and/or projections.

28    Defendant Mark Greenquist ("Greenquist") joined Symbol as its Senior Vice President-Finance and Chief Financial Officer in February 2003 from Agere Systems, Inc., where he was Executive Vice President and Chief Financial Officer, responsible for executive management and the oversight of its financial operations. Before joining Agere Systems, Greenquist was based in Zurich, Switzerland, with General Motors Europe as Vice President of Finance and Chief Financial Officer. In 1986, he joined the New York General Motors finance

12

organization and held a number of positions in GM's New York Treasurer's Office, including corporate finance, capital markets, foreign exchange and commodity hedging, and investor relations. Greenquist was forced to resign from his positions with the Company in July of 2005. At all times herein, in his capacities with the Company's accounting and control offices, Greenquist was responsible for preparing and/or assisting in the preparation of the Company's financial disclosures and/or projections.

29     Defendant Peter Lieb ("Lieb"), joined Symbol as its Senior Vice President, General Counsel and Secretary in October 2003 from International Paper Company, where he served in various senior legal positions including Deputy General Counsel and Chief Counsel for litigation from September 1997 to October 2003. Prior to his tenure at International Paper Company, Mr. Lieb was Assistant General Counsel for GTE Service Corporation, a litigation partner at Jones, Day, Reavis & Pogue and served as an Assistant United States Attorney for the Southern District of New York. Early in his legal career, Mr. Lieb served as a law clerk to U.S. Supreme Court Chief Justice Warren Burger. At all times herein, in his capacity with the Company, Lieb was responsible for the Company's compliance with state and federal securities laws and for assisting in the implementation and enforcement of all necessary internal control procedures.

30     Defendant John Bruno ("Bruno") is presently installed as Symbol's Senior Vice President — Corporate Development. Bruno first joined Symbol as its Senior Vice President — Business Development and Chief Information Officer in November 2002 from Cisco Systems, Inc. While at Cisco Systems, Inc. he served as Vice President of Technology Marketing and Vice President of Information Technology from June 2000 to November 2002. Prior to that,

13

Bruno served as Executive Director of Information Technology for Bristol-Myers Squibb, Inc.

from September 1998 to June 2000 and as Director of Information Technology at United Parcel

Service from August 1990 to September 1998. At all times herein, Bruno was responsible, in his

various capacities, for publishing and/or reviewing the Company's various public

pronouncements and/or did participate in the review and/or gathering of information relating to

the Company's financial results and financial projections.

31      Unless otherwise indicated, Defendants Nutti, Ianuzzi, Greenquist, Lieb,

Langrock and Bruno are also referred to as the Officer Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

32      As indicated above, at all times herein, Symbol has been involved in the business

of producing and servicing products used for point-of-sale, inventory management, production

control, and other logistical applications. As part of this process, Symbol produces bar code

scanners, Palm OS- and Windows-based handheld computers, wireless networking equipment,

radio frequency identification (RFID) systems, and retail kiosks. Successful in its field, the

Company's customers have included enterprises in the warehousing and distribution, postal,

retail, transportation, industrial, and health care industries, as well as schools and government

entities.

33      Historically, the Company has grown through both the acquisition of other

businesses as well as through the diversification of its own original product lines. For instance,

in 2002, Symbol acquired @POS, a business which bolstered the Company's product line with

point-of-sale transaction terminals. In fact, notwithstanding the highly negative news emanating

14

from the Company throughout 2003, Symbol acquired Matrics, a manufacturer of radio frequency identification (RFID) systems, and went on to acquire Trio Security, a maker of computer security applications, in 2004.

34      Between 2001 and 2004, the Company was the subject of investigations by the Securities & Exchange Commission ("SEC") and the United States Postal Inspection Service and was the target of several substantial federal securities class actions filed by disgruntled shareholders which alleged material violations of the Exchange Act. The investigations undertaken by the above-referenced government authorities led to both Robert Asti (a former leading sales executive for the Company) and Robert Korkuc (a former chief accounting officer for the Company) to plead guilty to federal securities fraud charges and led to the indictment of a number of other Company executives and officers.

35      In fact, in 2003, as a direct result of the above-referenced scandals, the Company's Chief Executive Officer, Tomo Razmilovic, was replaced in this position by Chairman of the Board, Jerome Swartz. Shortly thereafter, Swartz was replaced by Richard Bravman in the role of C.E.O. followed by the resignation of Swartz, and the Company's chief legal officer, Leonard Goldner, in the Fall of 2003. This was followed by the departure of Richard Bravman and his replacement by Defendant Nuti as well as resignation and/or departures of several other high-ranking executives with Symbol.

36      Ultimately, the allegations of wide-spread wrong-doing within the Company appeared to have been well-founded. In a complaint filed against Symbol, the SEC accused Symbol of massive securities fraud violations related to the reporting, record-keeping and internal control provisions of the federal securities laws. The Complaint identified no less than

15

eleven former Symbol executives in connection with their roles in the fraud. The SEC's complaint indicated that between 1998 until early 2003, Symbol and the other defendants engaged in numerous fraudulent accounting practices and other misconduct that had a cumulative net adverse impact of over $230 million on Symbol's reported revenues and over $530 million on its pre-tax earnings. "The scope and magnitude of the fraud at Symbol Technologies warrant the imposition of significant penalties — not just against individual wrongdoers, but also against the company responsible for having created and fostered the environment in which the wrongdoing took place," said Stephen M. Cutler, Director of the Commission's Division of Enforcement.

37     The Commission's complaint against the Company alleged as follows:

> The defendants engaged in a fraudulent scheme to inflate revenue, earnings and other measures of financial performance in order to create the false appearance that Symbol had met or exceeded its financial projections. Defendant Tomo Razmilovic, Symbol's former president and CEO, and others at the company fostered a "numbers driven" corporate culture obsessed with meeting Wall Street estimates. With no regard for generally accepted accounting principles (GAAP) or their financial reporting obligations, the defendants used the following fraudulent schemes to align Symbol's reported financial results with market expectations: (a) a "Tango sheet" process through which baseless accounting entries were made to conform the unadjusted quarterly results to management's projections; (b) the fabrication and misuse of restructuring and other non-recurring charges to artificially reduce operating expenses, create "cookie jar" reserves and further manage earnings; (c) channel stuffing and other revenue recognition schemes, involving both product sales and customer services; and (d) the manipulation of inventory levels and accounts receivable data to conceal the adverse side effects of the revenue recognition schemes. Together with Razmilovic, defendants Kenneth Jaeggi, Brian Burke, Michael DeGennaro and Frank Borghese comprised most of Symbol's senior management team during the relevant period and directed the fraud. Defendants Christopher DeSantis, James Heuschneider, Gregory Mortenson, James Dean and Robert Donlon were Symbol executives during this period and implemented the schemes.

> While the accounting fraud was occurring, defendant Leonard Goldner, Symbol's

16

former general counsel, manipulated stock option exercise dates to enable certain senior executives, including himself, to profit unfairly at the company's expense. Rather than use the actual exercise date as defined by the option plans, Goldner instituted, without board approval or public disclosure, a practice of using a more advantageous date chosen from a 30-day "look-back" period so as to reduce the cost of the exercise to the executive. To create the false appearance that these exercises actually occurred on the selected dates, Goldner had his staff backdate the requisite transactional documents and use the phony exercise dates in the forms on which the executives reported their acquisitions to the Commission and the public.

In addition to committing securities fraud, some of the defendants interfered with two internal investigations into Symbol's accounting practices and delayed the Commission's investigation. After the Commission began its investigation, Jaeggi directed subordinates to discard copies of "Tango sheets" and other incriminating documents. During the same relevant period, DeGennaro rigged the revenue recognition data provided to the forensic accountants involved in the first internal inquiry, instructed subordinates to withhold or delay providing information to subsequent internal investigators, and directed employees to sanitize key portions of schedules that they intended to provide to the investigators.

While these defendants were engaged in their efforts to derail the investigations and cover up the fraud, Symbol filed multiple periodic reports containing financial results that it has since restated, including its Form 10-K for 2001 and a Form 10-Q that Jaeggi falsely certified in violation of the new Sarbanes-Oxley certification provisions.

38    The sheer scope of the wrongdoing at Symbol was confirmed in a subsequent

article which appeared in The International Herald Tribune, which reported:

> The chief federal prosecutor in the case, Roslynn Mauskopf, the U.S. attorney for the Eastern District of New York, called the criminal scheme "breathtaking in its scope" and "a veritable playbook of corporate fraud."
>
> The fraud, according to the U.S. Securities and Exchange Commission, which filed civil charges, ran from 1998 to February 2003 and included a smorgasbord of tactics known as tango sheets, cookie jar reserves, candy deals and channel stuffing -- some that are well known and others that were devised by the former Symbol executives.
>
> The intent, according to the SEC, was to artificially lift revenue and reduce expenses, falsely increasing reported earnings. The books were juggled every which way to meet or exceed the quarterly estimates of securities analysts, the SEC said; the effect

17

was to prop up Symbol's stock price, ensuring managers bonuses, if not promotions.

"What's unusual about Symbol is the great concentration of fraudulent practices in a single case," said George Stepaniuk, assistant regional director of the SEC office in New York, which filed charges against the company as well as the former executives.

39     By June of 2004, the sheer scope of the prior wrongdoings at Symbol was also confirmed when eight of Symbol's former executives - including the Chief Financial Officer, Senior Vice President of Sales and General Counsel - were indicted on charges of accounting and securities fraud. By that time, five other Symbol executives had previously pleaded guilty to fraud.

40     Within the context of the above-referenced set of circumstances, the new management team and new directorate of Symbol were acutely aware of the need to restore the faith of the Company's shareholders and the markets through the implementation of aggressive internal controls that would insure the accuracy of the Company's publicly reported financial statements and forecasting.

## Symbol's Erroneous "Damage Control" Pronouncements

41     As part of the "renewal" process aimed at reviving the Company's public standing, Symbol's management and directors repeatedly touted how it had proverbially "turned a corner" and was seeking to substantially improve its internal control functions in order to avoid further embarrassing disclosures of continued misreporting of the Company's financial and business conditions and prospects.

42     As an initial matter, in the wake of the above-referenced turmoil, a new management team was installed in the Company, with Defendant Lieb taking over as Symbol's

18

general counsel and corporate secretary. At that time, the Company touted Lieb's expertise in "prosecuting business crimes, including securities fraud and money laundering." Additionally, Defendants Langrock and Greenquist were brought into the Company for the specific purpose of strengthening Symbol's control and accounting functions. Moreover, Defendant Nuti was elevated as Symbol's new Chief Executive Officer and his commitment to substantive change in the Company's internal operations was reiterated in numerous public pronouncements which promoted Symbol's revised methods of doing business. Bruno, a holdover from the old regime, maintained his position with the Company as, over the course of the ensuing months, the composition of the Company's directorate also underwent substantial changes with the additions of Defendants Yellin, Kozel and Chrenc.

43      Aside from changes in Company personnel, Symbol management attempted to quell the market's dissatisfaction with Symbol's prior management and methods of operation through frequent contact with the media. For instance, during the course of a January of 2004 interview with CNBC reporter Liz Clayman, Defendant Nuti acknowledged the existence of the SEC's continuing inquiries as to the Company's business operations and stated that "we have been working with them - well, since I've been here, the last 15 months, to put our company back in the right shape." During the interview, Nuti also commented that, insofar as turning Symbol into a profitable business, "it s awfully difficult to take a company who has muscle memory of how not to make money, and then to create a profitable and financial company out of that. But it just goes to show you the strength and the power of Symbol Technology s technology, our innovation, our people. And *we re awfully proud of the turnaround financially. We're awfully proud of the turnaround organizationally as well.* So we re looking forward to success in the

19

future. To the extent of which it s going to be successful, *we ll be talking about in the short-term with the financial analysts, and also yourself.*"

44      In furtherance of the publicly touted "reform" effort at Symbol, the Company announced in May of 2004 that, following a disagreement over accounting treatments and the discovery of reported deficiencies in the Company's decentralized accounting structure, Symbol dismissed auditor Deloitte & Touche and hired Ernst & Young as its replacement.

45      The promotion of the "reform" movement within the Company continued apace as, during a conference call on early June of 2004, the Company announced that it had set aside sufficient reserves to cover the $135 million total it agreed to pay to settle allegations of accounting fraud, executives said during a conference call Thursday. At that time, Company officials announced that Symbol had set aside $142 million to cover the settlements. Under these settlements, Symbol was to pay the Securities and Exchange Commission $37 million in cash and would also settle the pending stockholder class-action lawsuit by paying $1.75 million in cash and $96.25 million in Company stock. Reacting to the belief that Symbol had indeed put its past questionable practices (and legal culpability) behind it, the market signaled confidence that Symbol had effectively "turned a corner" as the price on openly traded Company stock rose 65 cents, or 4 percent, to $15.36 in trading within several days after the announcement of these combined settlements.

46      To further promote the "new culture" at Symbol, on June 3, 2004, Defendant Nuti, commented on the $138 million settlement. In response to what the Company has done to ameliorate shareholder uncertainty as to the integrity of the Company's reported financial results, Nuti lauded various changes made inside the Company, "including separating our chairman and

20

chief executive roles, revamping all of our committee structures, making sure our board is largely independent and not full of insiders, and making sure our business controls, *financial controls and systems are up to speed and transparent.*"

47    The effort to promote Symbol's changed internal control procedures was also undertaken via a June of 2004 article which appeared in The International Herald Tribune. In the article, Defendant Nuti described the revelation of the accounting and reporting deficiencies during 2003 as "the most disturbing moment in my career." The article went on to add that Symbol's Board had "assured Nuti that the shady accounting was a thing of the past." On this basis, Noti indicated that the 2003 revelations demonstrated "how much more work we really had to do in reforming and rooting out a toxic subculture at the company." The article cited as fact that, under Nuti, fifteen of the sixteen members of Symbol's senior management had been replaced and that the new top-line executives were "young, mostly in their late 30's and early 40's, and all were recruited by Nuti." The article also indicated that under Nuti, more than 130 managers and executives have been replaced, and dozens were fired. To this end, Nuti commented that "[c]oming in, what I had in mind was one-tenth of what we eventually did over the last 18 months." Additionally, in the furtherance of Nuti's representations that he was taking a hands-on role in reviewing the Company's operating procedures, he informed at least one reporter that he had personally "walked through" several transactions and characterized the Company's prior methods of doing business as "chaos," with the entire focus being "entirely on the financial result, anyway it took, instead of on the integrity of the process that led to the result." Futhermore, Nuti indicated that, under the former regime "channel stuffing was systematic. . .It was cultural." The clear intimation of the interview was that under Nuti and his

21

team, Symbol would actively implement and enforce new, rigorous and efficacious internal controls.

48 Along the same lines, in the Company's 2004 10-K Report filed with the SEC and disseminated to the public in the Spring of 2005, the Company sought to confirm the image that Symbol had changed its methods of operation and reaffirmed the adequacy of its revised internal control systems, to wit:

> Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. The Company maintains accounting and internal control systems which are designed to (1) maintain records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.
>
> As of December 31, 2004, management conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the framework established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on this assessment, management has determined that the Company's internal control over financial reporting as of December 31, 2004 is effective.*
>
> ***
>
> Management's assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2004 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report included on page 91 of this report.

49 Furthermore, in the Company's Proxy distributed to Symbol's shareholders as of April of 2005, the Symbol also explained how it had upgraded the auditing function of the Audit

22

Committee of the Board of Directors. Promoting the fact that it had met *at last twenty times*

*during 2004*, Symbol indicated that it was in the process of instituting a second layer of Board

accountability, to wit:

> On February 9, 2004, the Board of Directors also formed the Risk Subcommittee of the Audit Committee. The purpose of the Risk Subcommittee of the Audit Committee is to work with the Company's management to (a) regularly survey all areas of significant potential business and legal risk to the Company and (b) ensure that reasonable and prudent proactive mitigation strategies are in place and are executed effectively. It is the intention of the Board of Directors to populate the Risk Subcommittee of the Audit Committee upon the election of additional members to the Board of Directors. In the interim, management regularly reports to the entire Board of Directors with respect to potential business and legal risks and the execution of mitigation strategies.
>
> The Board of Directors has determined that all of the current members of the Audit Committee are independent within the meaning of SEC regulations, the listing standards of the NYSE and the Company's.

50      Additionally, in Symbol's Proxy of April of 2005, the Company included a report

from the Audit Committee of the Board. Endorsed by Defendants Chrenc, Iannuzzi and

Samenuk, the Audit Committee further bolstered the illusion that there had been and continued to

be adequate internal control mechanisms and indicated as follows:

> As more fully described in its charter, the Audit Committee reviews Symbol's financial reporting process on behalf of the Board. Management has the primary responsibility for the financial statements and internal control over financial reporting. Symbol's independent registered public accounting firm, Ernst & Young LLP, are responsible for (1) performing an audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) to obtain reasonable assurance that Symbol's consolidated financial statements are free from material misstatement and for expressing an opinion on the conformity of the financial statements with accounting principles generally accepted in the United States, and (2) performing an audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) to obtain reasonable assurance that management's assessment that Symbol maintained effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects and to obtain reasonable

23

assurance that Symbol maintained effective internal control over financial reporting as of December 31, 2004, in all material respects. The internal auditor is responsible to the Audit Committee and the Board for testing the integrity of the financial accounting and reporting control systems and such other matters as the Audit Committee and Board determine from time to time.

51    The Audit Committee of Symbol hereby reports as follows:

    1. The Audit Committee has reviewed and discussed the audited financial statements and management's report on internal control over financial reporting with Symbol's management.

    2. The Audit Committee has discussed with Ernst & Young LLP the matters required to be discussed by Statement of Auditing Standards No. 61, as amended by Statement of Auditing Standards No. 90 (Audit Committee Communications).

    3. The Audit Committee has received and reviewed the written disclosures and the letter from Ernst & Young LLP required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees), has discussed with Ernst & Young LLP their independence and considered whether the provision of non-audit services is compatible with maintaining Ernst & Young LLP's independence.

    4. *Based on the review and discussion referred to in paragraphs (1) through (3) above, the Audit Committee recommended to the Board of Directors of Symbol, and the Board has approved, that the audited financial statements and management's report on internal control over financial reporting be included in Symbol's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, for filing with the Commission.*

(emphasis added.)

## Continued Financial Reporting

52    Within the context of the above-referenced efforts to publicly promote reform

within Company, Symbol continued to report its' financial results, with information relating to

on-going financial success being disseminated to the investing public along with projections of

the Company's short term goals and results. For instance, on May 10, 2004, Symbol reported that

the Company's revenue for the first quarter ended March 31, 2004, was $419.7 million, an

increase of 9 percent over first-quarter 2003 revenue of $386.3 million and an increase of 7 percent over fourth-quarter 2003 revenue of $393.0 million, with first-quarter net earnings being assessed at $6.8 million, or $0.03 per share. As part of the Company's press release touting these results, Nuti indicated that "first-quarter 2004 revenue came in above the top of our range and set a vigorous pace for 2004. Product revenue growth was a key driver of our success and reflected enthusiasm for some of our newer products as they gain traction in the marketplace. It also underscores our belief that we are gaining market share, and that our enterprise mobility systems strategy wins out over point product offerings from our competitors. *While operational expenses exceeded our expectations, there were several one-time charges associated with cleaning up the past. We remain focused on improving the bottom line through better expense controls, increasing productivity and continuing to streamline operations.*" In the same press release, Defendant Greenquist cited the "balance sheet improvement" as being pointed to "the continued solid financial performance we anticipate."

53      Symbol also announced record revenues for its third quarter ended September 30, 2004 via a press release of October 26, 2004. Citing revenues for the third quarter at $442.7 million (a gain of 17 percent over the same quarter during 2003) and an increase of slightly over 2% from the immediate prior quarter, the Company reported net quarter earnings of $21.1 million, or $0.09 per share, compared with third-quarter 2003 net earnings of $11.5 million, or $0.05 per share, and second-quarter 2004 net earnings of $28.8 million, or $0.12 per share. The Company also indicated that, excluding the effect of the purchase of Matrics, Inc., net earnings and earnings per share were $34.9 million and $0.14, respectively, exceeding by $0.02 the Company's third-quarter guidance, which when provided July 29, 2004, excluded any impact of the

25

acquisition. In the press release announcing these results, both Nuti and Greenquist expressed

optimism relative to these financial results. In fact, the Company also published the following

"future guidance" as to the Company's future performance:

> **2004 Fourth-Quarter Guidance**
> Building on the strong 2004 third-quarter financial results, the Company expects that
> fourth-quarter 2004 revenue will be in a range of $445 million to $450 million, flat
> to up 2 percent sequentially and up 13 percent to 14 percent year-over-year. Earnings
> per share for the fourth-quarter of 2004 are expected to be $0.09 to $0.10. It should
> be noted that this guidance includes an anticipated negative $0.05 impact on
> fourth-quarter earnings resulting from the combined impact of the Matrics acquisition,
> including interest expense and amortization of fees associated with the short-term debt
> financing as well as the dilutive impact of an anticipated equity offering.

54    Notwithstanding the Company's prior representations, on November 8, 2004,

Symbol announced a two-week delay in filing with the SEC the Company's quarterly report on

Form 10-Q for the quarter ended September 30, 2004. Attempting to promote the aggressive

nature of the Company's new internal control procedures, Symbol attributed the delay, in part, to

the possibility that the Company might need to amend one or both of its previously filed reports

for 2004. The press release stated, in part, as follows:

> "As part of our regular control procedures, we discovered certain discrepancies in the
> amount of inventory at a distributor as well as inventory on hand that affected our
> previously announced results. As such, we are delaying our third-quarter filing with
> the SEC for approximately two weeks," said William Nuti, Symbol president and
> chief executive officer. "We've moved swiftly to ascertain the nature and extent of
> these discrepancies. We are in the process of determining whether any amendment to
> our previously filed SEC quarterly reports is necessary. *Symbol is committed to
> ensuring that its financial statements are accurate and can be relied upon by our
> shareholders."*
>
> **Nature of Discrepancies**
>
> During Symbol's regular physical inventory control testing, two independent errors
> were discovered. These errors were the result of two discreet events.

One event had to do with inaccurate inventory levels reported to Symbol by a large distribution partner. The underreported inventory levels resulted in Symbol inaccurately recording approximately $3.3 million in sales in the third quarter. This was an oversight on the part of the distributor, which made Symbol aware of the reporting error as soon as it was discovered. This error occurred only in the third quarter of 2004, and no previous quarter was affected.

The other discrepancy was the result of errors that occurred at a Symbol-owned distribution facility that serves one of its large retail customers. The distribution center relies on its own internal reporting system, and misreported quarter-end inventory levels that resulted in inaccurate sales reporting. Consequently, revenue for the nine months ended September 30, 2004, was overstated by approximately $10 million. Symbol believes that the large majority of this overstated revenue relates to third quarter 2004, with the remaining balance in prior quarters.

55    Despite Symbol's prior agreements with the SEC lawsuit to implement independent review procedures of the Company's accounting practices and internal control systems, Symbol's financial statements and other representations for the first three quarters of 2004 contained materially false and misleading assertions and were in violation of Generally Accepted Accounting Practices because such financial statements materially overstated Symbol's revenues.

56    Attempting to place the best "spin" on the Company's continued difficulties surrounding its financial reporting, Symbol announced it had filed with the Securities and Exchange Commission the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2004 via a press release dated November 15, 2004. In the press release, Symbol confirmed that the delay in releasing its third quarter filing was due to the discovery of "certain discrepancies" in the amount of inventory that affected third-quarter 2004 results that were announced on October 26, 2004:

> "Today we filed our 10-Q for the third quarter within the extension period permitted by the SEC rules. We took the additional time in order to investigate the previously

27

reported discrepancies and amend our results as necessary,""said William Nuti, Symbol president and chief executive officer. "We are confident that the results included in today's filing accurately reflect our operating results. We are still investigating the events leading to the discrepancies discovered to ensure that these issues are appropriately addressed and rectified."

57    In the same November 15, 2004 press release, the Company reported that revenue

for the nine months ended September 30, 2004, was $1,281.6 million, an increase of 13 percent

over revenue of $1,137.3 million in the nine months ended September 30, 2003. Gross profit for

the nine months ended September 30, 2004, was $592.3 million or 46.2 percent compared to

$491.2 million or 43.2 percent in the nine months ended September 30, 2003. Operating expenses

decreased $15.5 million to $490.5 million for the nine months ended September 30, 2004, from

$506.0 million for the nine months ended September 30, 2003. Net earnings were $53.4 million,

or earnings of $0.22 per diluted share, for the nine months ended September 30, 2004, compared

with a net loss of $12.9 million, or a loss of $0.06 per diluted share, for the nine months ended

September 30, 2003. The Company also posted Fourth Quarter 2004 guidance, as follows:

> The Company's previously announced fourth-quarter 2004 guidance remains unchanged expecting that fourth-quarter 2004 revenue will be in a range of $445 million to $450 million, up 4 percent sequentially and up 13 percent year-over-year. Earnings per share for the fourth-quarter of 2004 are expected to be $0.09 to $0.10. It should be noted that this guidance includes an anticipated negative $0.05 impact on fourth-quarter earnings resulting from the combined impact of the Matrics acquisition, including interest expense and amortization of fees associated with the short-term debt financing as well as the dilutive impact of an anticipated equity offering.

58    Symbol announced results for the fourth quarter and full year ended December 31,

2004 via a press release on March 1, 2005. The press release indicated that revenue for the fourth

quarter ended December 31, 2004, was a record $450.5 million, slightly exceeding the Company's

guidance of $445 million to $450 million. Fourth-quarter revenue represented a 15 percent

increase compared to the $393 million in revenue reported in the corresponding year-earlier

period. Gross margin, at 48.1 percent, were above 45 percent for the fifth sequential quarter.

Fourth-quarter net earnings were $28.5 million, or $0.11 diluted earnings per share, compared to

$16.2 million, or $0.07 diluted earnings per share, in the corresponding year-earlier period. The

Company also reported that revenue for the year ended December 31, 2004, was $1.73 billion,

compared to $1.53 billion for the year ended December 31, 2003. Net earnings for the year ended

December 31, 2004, were $81.8 million, or $0.33 diluted earnings per share, compared to net

earnings of $3.3 million, or $0.01 diluted earnings per share, in the prior year. Insofar as future

guidance was concerned, the Company stated as follows:

> ### 2005 First-Quarter Guidance
> Based on the strong fourth-quarter 2004 results, the Company expects that
> first-quarter 2005 revenue will be approximately $465 million, up 3 percent
> sequentially and up 11 percent year over year.
>
> Earnings per share for the first quarter of 2005 are expected to be $0.10 to $0.11. This
> range does not include the impact, if any, of the Company's eventual issuing of shares
> to class action plaintiffs from a settlement approved in October 2004. The Company
> currently has accrued $86.6 million relating to this settlement. However, the
> accounting, under the terms of this settlement, requires the Company to
> mark-to-market the appreciation in the value of shares to be issued above a
> pre-determined price in the settlement of $16.41 per share through a non-cash charge
> to earnings. The Company believes that for every $1.00 per share in appreciation of
> its market value above $16.41, the impact to earnings would be approximately $3.2
> million, or $0.01 per diluted share.

59      The same press release also cited the "positive momentum" exemplified in the

Company's reports and quoted Defendants Nuti and Greenquist, as follows:

> "Fourth quarter 2004 and the year were validation of the hard work, effort and results
> of our associates and channel partners. I want to recognize and thank them for their
> focus and execution. During the last year, Symbol has undergone significant change
> management that positively influenced customer and partner satisfaction, bottom-line
> results, cash flow and productivity, and provided us a strong foundation of business

29

and financial controls. The addition of Matrics and the work done by the Symbol team on our vision-to- execution plan set the foundation for future success. We look forward to 2005 and beyond with confidence and excitement,"William R. Nuti, Symbol president and chief executive officer, said.

"Going forward, our goal is to drive profitable top-line growth and increase our market share in all sales theaters, product divisions and vertical markets. We need to do this while staying 100 percent laser focused on becoming an industry leader in cost structure, both process and technology innovation, product lifecycle management and solutions selling," Nuti added.

"Our earnings performance in the fourth quarter was encouraging, and *we're also very pleased to be able to announce that Symbol will be certifying its compliance with the internal control provisions of Sarbanes-Oxley 404 -- an outstanding achievement in light of where we were from an internal controls perspective two years ago," Mark T. Greenquist, senior vice president and chief financial officer, said.*

60      Symbol next disclosed financial results for first quarter 2005 on May 3, 2005.

According to the press release prepared by the Company, revenue for the first quarter ended

March 31, 2005, at $457.5 million, representing the Company's highest quarterly revenue in its

history as well as a gain of 9 percent over first-quarter 2004 revenue of $419.7 million and an

increase of 2 percent over fourth-quarter 2004 revenue of $450.5 million. Promoting the

"continued strong operating and financial performance of the Company," the press release stated

in relevant part as follows:

## Continued Strong Operating and Financial Performance

"The positive trends that we experienced during 2003 and 2004 continued in 2005's first quarter. At $457.5 million, this was a record-revenue quarter for Symbol, although it was slightly lower than we had expected, as the economy and information technology spending cooled in Q1," said William R. Nuti, Symbol president and chief executive officer.

"Going forward, we're planning to adopt a more concerted approach to reducing total operating expenses, both on an absolute basis and as a percentage of sales. As we complete our three-year turn-around plan, which we began to implement in 2003, our attentions can now be focused on organizing around growth and profitability versus

30

a successful turn-around. Net-net, with the turn-around phase of our strategic plan nearing its end, now is the right time to take the work that has been substantially completed and turn it into bottom-line leverage for our shareholders. While we cannot discuss details with you right now, our target is to lower our operating expense run rate to approximately $170 million by year-end 2005. On our 2005 second-quarter earnings call, likely to be held in early August, we will provide details on any charges associated with this plan and outline the anticipated financial impact to our operating margins in 2005," Nuti added.

Mark T. Greenquist, Symbol senior vice president and chief financial officer, said, "With cash flow from operations of approximately $73 million, 2005's first quarter represented another solid performance for cash generation. In addition, at $218 million, our cash balances at March 31, 2005, remained unchanged versus year-end 2004. That balance excludes the $52 million of restricted cash on the balance sheet. Also of note, the Company paid down an additional $50 million in bank debt in the first quarter."

## 2005 Second-Quarter and Full-Year Guidance

The Company expects that revenue in second quarter 2005 will be in a range of $460 million to $470 million, representing growth of 1 percent to 3 percent sequentially and 6 percent to 9 percent year-over-year. With regard to full-year revenue guidance, the Company believes that revenue growth for fiscal year 2005 will likely be at the lower end of its previously disclosed 10 percent to 15 percent range. Second-quarter gross margin is expected to be in the 45 percent to 46 percent range, and operating expenses are anticipated to be in a range of $177 million to $180 million.

Diluted earnings per share for second quarter 2005 are expected to be $0.05 to $0.07 per share, reflecting the anticipated impact of a change in New York state tax law that would result in a second-quarter effective tax rate of approximately 50 percent, compared to a normalized effective tax rate of 34 percent.

Without the one-time negative impact, diluted EPS would be $0.07 to $0.09, which would represent second-quarter operating margins of approximately 6.5 percent to 7.5 percent.

In addition to including diluted earnings per share in guidance for the second quarter ending June 30, 2005, under accounting principles generally accepted in the U.S. ("GAAP"), Symbol disclosed adjusted diluted earnings per share guidance after giving effect to the anticipated impact of a change in New York state tax law that would negatively affect diluted earnings per share for the second quarter ending June 30, 2005, that the Securities and Exchange Commission defines as a "non-GAAP financial measure." This non-GAAP financial measure should not be considered in

isolation or as an alternative to diluted earnings per share or any other measure of performance derived in accordance with GAAP. However, a non-GAAP measure provides useful supplemental information for management and investors and allows them to perform meaningful comparisons for the Company's past and present results. For a reconciliation of this non-GAAP measure, see the table below with the heading "Non-GAAP Financial Measure."

## The Myth of Internal Control Unravels

61     Despite the fact that the Company had attempted to portray the anomalies which took place at the end of 2004 as being indicative of the implementation of Symbol's new internal controls and financial accountability, in an article of May 10, 2005 in Newsday, it was reported that during the course of the previous day's annual shareholder meeting, Defendant Greenquist first cast doubt on the viability of the Company's ability to provide meaningful guidance to the financial markets, commenting that the Company needed to institute changes to improve the predictability of its business. Moreover, at that time, Defendant Lieb dropped a veritable bombshell on the illusion that the Company had effectively righted itself from past financial reporting improprieties when he disclosed that the Company had been "fully cooperating" in an "informal" federal probe of "errors" that appeared in a Symbol financial release during 2004. In fact, during the shareholder meeting, Lieb admitted that "I just can't predict what will happen" relative to the on-going federal probe.

62     Consistent with the implicit admission that its prior forecasts were, at best, highly dubious, on June 28, 2005, Symbol announced a restructuring plan to reduce costs and drive profitability. Within the text of the press release speaking to the point of the need for "restructuring", the Company also stated that it was revising its second quarter financial outlook, as it believed its sales had been negatively affected by continued economic sluggishness,

32

particularly in the global retail market. In relevant part, the press release intimated that

notwithstanding the need to revise its forecasting, the Company, through its management, was in

the process of transitioning from a focus on reforming and reinvigorating its internal control

procedures to reaching out to broaden its customer base and ultimate profitability:

> "*With the turnaround phase of our transformation plan nearing its end*, we need to shift resources to efforts focused on growing profitability in 2005 and beyond. Over the past several years, we have allocated substantial resources to certain functional areas in order to permit Symbol to successfully implement its turnaround program. *Now that we are in the next phase of Symbol's evolution, we must balance our spending on the activities needed to drive profitable growth, while maintaining strong financial controls and business processes*," said Bill Nuti, Symbol president and chief executive officer.

> ### Second Quarter Earnings Results

> Symbol currently expects revenue and earnings in the second quarter 2005 to be below the guidance provided in early May of revenue in the $460 to $470 million range and earnings per share in the $0.07 to $0.09 per share range, excluding a $5 million negative tax impact caused by a state tax law change. The Company now believes second quarter 2005 revenue and earnings will be approximately $440 million and $0.02 to $0.05 per share, excluding the negative tax impact and the restructuring and related charges. For the full year 2005, the Company anticipates revenue growth in the three to six percent range, versus previous guidance of the low end of the 10 to 15 percent range.

63    On July 14, 2005, Symbol issued what superficially appeared to be a multi-subject

press release. As an initial matter, the press release disclosed that, notwithstanding the early May

forecast of second quarter revenues in the $460 to $470 range and later "readjustments" of

revenue forecasts in the $440 million range, management now anticipated that revenues would

actually fall to within the $425 to $430 range. The Company also expected second quarter

operating expenses to be lower than the previous guidance of $177 to $180 million, including the

$7 million in expenses related to the legal defense of prior management. The second topic of the

press release related to the ascendency of Sal Iannuzzi to the position of Chief Administration and

33

Financial Officer in the wake of the resignation of Defendant Greenquist to "pursue other career interests." In this regard, the press release stated, in part, as follows:

> "While Symbol continues to undergo the implementation of new business processes across the organization, it is vital to have someone with Sal's operational and administrative expertise lead our efforts in these areas," said Nuti. "During the past three months, Sal has been instrumental in guiding the Company through a successful restructuring plan to reduce operating costs and has done so with the highest levels of efficiency and effectiveness. I'm excited to further benefit from Sal's superb talents, capabilities and business experience as he helps Symbol realize its true potential."

> "Symbol has made major strides in improving our financial controls, but much work remains in areas such as forecasting," noted Iannuzzi. *"I plan on intensely focusing my efforts on developing and implementing more effective forecasting processes."*

64     On July 18, 2005, Newsday reported that Nuti insisted that Greenquist, who had

served as finance chief since 2003, was " not being fired from the company." Nevertheless, the

article indirectly implicated the lack of internal controls relating to the reporting and forecasting of

the Company's financial results as being a prime motivation behind the putative "resignation" of

Greenquist. Indeed, in the article, Nuti stated that he would now "personally" take over

forecasting duties, with "direct assistance" from Iannuzzi. In this regard, Newsday reported as

follows:

> Senior vice president and chief administrative and control officer Sal Iannuzzi, who will take on the additional role of CFO, said in a statement, "Symbol has made major strides in improving our financial controls, but much work remains in areas such as forecasting." And according to the newspaper, in the conference call on Thursday, Iannuzzi said: "Two weeks ago we gave guidance and now we have to revise it. *That's just not acceptable.*"

Additionally, in the Newsday article, Iannuzzi admitted that the difficulty in accurately

providing meaningful forecasts was structural in nature, to wit:

> Part of the problems with forecasting at Symbol, Iannuzzi reportedly acknowledged, stems from a number of "necessary" but "draconian" measures and controls

34

implemented after the discovery of widespread accounting fraud at Symbol, according to the paper. "What we're seeing is that some of these procedures are extremely difficult to deal with," Iannuzzi stated, according to Newsday. "It's one of the principal reasons we're having such a difficult time giving you a forecast that works."

65    On August 1, 2005. Symbol announced that Bill Nuti, president and chief

executive officer, resigned his management and director roles to become CEO of NCR

Corporation (NYSE: NCR) and that Sal Iannuzzi had been named interim president and CEO

while a search for a replacement is conducted. At the same time, the Company also announced

financial results for the second quarter of 2005, ended June 30, 2005, and confirmed that the

initial and subsequent forecasts issued by the Company were completely unrealistic. The press

release stated in relevant part as follows:

> Net revenue for second-quarter 2005 was $427.8 million, compared with $432.8 million for the second quarter 2004. Net loss for the second quarter 2005 was $30.5 million or $0.12 per share versus net earnings of $28.8 million or $0.12 per share for the second quarter 2004. Net loss for second-quarter 2005 includes pre-tax restructuring charges ($31.2 million), pre-tax asset impairment charges ($11.6 million), a pre-tax benefit related to a class action lawsuit ($7.1 million) and tax benefits of $0.6 million. These amounts aggregate to $35.1 million or $0.14 per share.
>
> Net revenue for the first six months of 2005 was $885.2 million, compared with revenue of $852.4 million for the first half of 2004. Net loss for the first half of 2005 was $8.3 million or $0.03 per share, versus net earnings of $35.6 million, or $0.15 per share for the same period in 2004.
>
> "The results we are reporting today are in line with the expectations we announced on July 14," said Sal Iannuzzi, Symbol interim president and chief executive officer. "While we are pleased with our operating expense performance and encouraged by our year-over-year growth in product bookings, we remain focused on balancing our spending on activities needed to drive profitable growth. Increasing shareholder value is our top priority, and our confidence in Symbol's future growth prospects and position as a leader in the enterprise mobility segment remains strong."

66    On August 2, 2005, Newsday reported that Nuti's resignation surprised Wall Street

analysts as well as the Company. In particular, the article indicated that the internal control

problems experienced at Symbol had been deeply embedded within the structure of the Company:

> Nuti, who could not be reached for comment, issued a statement that said, "I believe the company will continue to grow and prosper in the years to come." But in an unpublished interview earlier in the same year, Noti told Newsday that Symbol's problems ran deeper than he had expected. "I thought I was coming on board to do far lesser of a turnaround than I eventually had to do," Nuti said. His knowledge of the Company's problems covered "the tip of the iceberg," he said. "
>
> Had I known the scope, I wouldn't have come," Nuti added. "It was an extremely painful two years to go through."

67     Within days after the announcement of Nuti's departure and the continued

problems in providing accurate earnings guidance, a successful of federal class actions were filed

by irrate Symbol shareholders, claiming violations by the Company, Nuti and Greenquist of

federal securities laws.

68     By way of the continuing investigations of the SEC as well as the private class

actions mentioned above, Symbol is once again subject to millions of dollars of potential liability

and have already been damaged as a result of the conduct of the Director and Officer Defendants,

and each of them. In fact, in response to the combined disclosure of Nuti's resignation, the

admission of deep-seeded problems at Symbol as well as the Company's financial results,

Symbol's stock - and concomitant capitalization - was substantially eroded, with the shares falling

15 percent in one day.

## DEMAND FUTILITY

69     Plaintiffs bring this action derivatively in the right and for the benefit of Symbol to

redress injuries suffered, and to be suffered, by Symbol as a direct result of the breaches of

fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust

enrichment, as well as the aiding and abetting thereof, by the Director Defendants and the Officer

36

Defendants. Symbol is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70      Plaintiff will adequately and fairly represent the interests of Symbol in enforcing and prosecuting its rights.

71      Plaintiff is owner of the stock of Symbol during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

72      At the time of the filing of the original complaint, the Board of Directors of Symbol consisted of the following six individuals: Chrenc, Iannuzzi, Kozel, Lawrie, Samenuk and Yellin.. Plaintiffs did not make any demand on the Board of Directors of Symbol to institute this action because such a demand would have been a futile, wasteful and useless act, particularly for the following reasons:

(a)      At all times herein, Symbol's Board of Directors made the decision to implement what turned out to be inadequate and ineffective internal controls over its operations and financial reporting. According to Symbol's Audit Committee charter, one of the ways that the Board of Directors attempted to meet its financial control duties was to have the Audit Committee review the adequacy and effectiveness of Symbol's financial and accounting controls. The Audit Committee met at least twenty times during the during 2004. Each of the Director Defendants was also aware that a pending deadline (November 2004) under the Sarbanes Oxley Act (the "Act") was approaching that required adequate internal financial controls to counter potential fraud. The pending deadline for compliance with the Act as well as Symbol management's past history of improprieties placed upon the Director Defendants a heightened duty to ensure that

37

adequate internal controls were in place. However, despite the Board's earlier decision and their heightened duties, the Board admittedly failed to have its management thoroughly review its financial statements and projections in order to ensure their viability. The risk that the Director Defendants ignored was not negligible, as the resulting restatements of the Company's earnings in 2004 and significant "adjustment" of its forecasting during 2005 substantially damaged the on-going confidence of the market in ability of the Company's management to provide accurate financial information. In light of these facts, each of the Director Defendants face a substantial likelihood that they have breached their duties of due care and good faith which they owed to Symbol and its shareholders. As a result of these Defendants' breach of their duties, any demand upon them would have been futile;

(b)     Symbol's Board of Directors was on notice of the Company's inadequate financial and accounting controls by virtue of clear warnings of potential and actual misconduct within Symbol. These warnings included the initial wave of legal and governmental actions against Symbol during 2002 through 2004. Additional signs were given to the directorate regarding the lack of certainty relating to Symbol's financial reporting and projections with reference to the revisions in the Company's third quarter of 2004 financial results. Despite these clear warnings, the Board of Directors failed to take any meaningful action to correct Symbol's woefully inadequate financial and accounting controls - especially with reference to the viability of the Company's "guidance" projections. Accordingly, demand upon Symbol's Board of Directors would have been a useless and futile act;

(c)     The principal professional occupation of Ianuzzi is his employment with , pursuant to which he received and continues to receive substantial monetary compensations and

38

other benefits. Accordingly, he lacks full and complete independence from the remaining

Director Defendants (and especially Chrenc, Kozel and Yellin), who are not disinterested and/or

independent and who exert influence over defendant Ianuzzi's compensation by virtue of their

positions as members of the Compensation Committee. This lack of independence rendered

defendant Ianuzzi incapable of impartially considering a demand to commence and vigorously

prosecute this action;

(d)     According to Symbol's Proxy Statement filed with the SEC in 2005, non-

employee members of the Board are paid an annual retainer of $30,000 and also receive a fee of

$2,000 for each Board of Directors meeting they attend. Additional compensation is provided in

that all members of the Audit Committee, Compensation Committee and Nominating and

Corporate Governance Committee other than the chairman receive additional annual retainers in

the amount of $25,000, $15,000 and $10,000, respectively. Additionally, the chairmen of the

Audit Committee, Compensation Committee and Nominating and Corporate Governance

committee receive additional annual retainers in the total amount of $40,000, $25,000 and

$15,000, respectively. Thus, an individual such as Defendant Chrenc, who is on virtually every

committee of the Board, can earn a *minimum* of $135,000 per year, over and above the $2,000 per

appearance fee for simply attending each Board meeting. Moreover, as per the disclosures in the

Company's latest Proxy statement, Directors are eligible to receive equity compensation awards,

including option grants and shares of restricted stock, under our 2004 Equity Incentive Award

Plan, which became effective in April 2004. Following the adoption of this amendment

by the Compensation Committee, upon initial election or appointment to Symbol's Board of

Directors each new non-employee director will be granted an option to purchase 25,000 shares of

39

our stock and will be awarded 7,500 shares of restricted stock. In addition, each year continuing non-employee directors who have served for a period of at least 11 months will be granted an additional option to purchase 15,000 shares of our stock and will be awarded an additional 7,500 shares of restricted stock. Options granted to non-employee directors will have an exercise price equal to the fair market value of our stock on the date of grant and will have a maximum term of ten years. Options and restricted stock awards generally will be made to non-employee directors as of the date of each annual meeting of our Stockholders and, subject to the director's service as a director, will vest as of January 1 of the calendar year immediately following the date of grant. As of the date of this proxy statement, none of our non-employee directors has received any of these formula-based options or restricted stock awards. However, in May 2004,. Iannuzzi was awarded 10,000 shares of restricted stock, and Messrs. Yellin and Chrenc were each awarded 5,000 shares of restricted stock, under our 2004 Equity Incentive Award Plan. The restrictions with respect to such shares of restricted stock lapsed on January 1, 2005. These restricted stock awards were granted in recognition of significant contributions made by Iannuzzi, Yellin and Chrenc during the period beginning in late 2003 and ending in May 2004 (and, in the case of Iannuzzi, to reflect his service as non-executive chairman of the board).

Prior to the adoption of the 2004 Equity Incentive Award Plan, our directors who were not also our employees were eligible to receive stock option grants pursuant to two non-employee director option plans. Accordingly, each of the Director Defendants were incapable of impartially considering a demand to commence and vigorously prosecute this action because they had an interest in safeguarding their unvested stock options, restricted shares and substantial cash compensation;

(e) According to Symbol's Proxy Statements filed with the SEC, Defendants Chrenc, Iannuzzi, Kozel, Samenuk and Yellin were, at various times during 2004 and 2005, members of the Audit Committee.[1] The Audit Committee met nine times during FY:04. The Audit Committee is responsible, by its own charter for discussing with Symbol management and Symbol's independent auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance. Nonetheless, the Audit Committee recommended and approved the Company's forecasts and guidance during 2005 either knowing or recklessly disregarding the fact that Noti was not personally reviewing said materials and that, by the Company's own admissions, structural changes made such forecasts or guidance statements highly suspect. By such actions and inactions, Defendants Ianuzzi, Kozel, Samenuk, Yellen and Chrenc breached their duties by causing or allowing the improper financials described

---

[1] According to the 1992 "Internal Control -- Integrated Framework," published by the Committee of Sponsoring Organizations of the Treadway Commission, which is the accepted standard for defining and assessing the effectiveness of the internal control of organizations in the United States, "internal control" is defined as follows:

Internal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories:

- Effectiveness and efficiency of operations.
- Reliability of financial reporting.
- *Compliance with applicable laws and regulations.*

(Emphasis added.)

41

above. As a result of these Defendants' breach of their duties, any demand upon them would have been futile;

(f)     The entire Symbol Board of Directors and senior management participated in the wrongs complained of herein. Symbol's directors are not disinterested or independent due to the following: each of the Director Defendants served on the Symbol Board during the at some point between May of 2004 and August of 2005. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced Defendants breached the fiduciary duties that they owed to Symbol and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Symbol Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Symbol to millions of dollars in liability for possible violations of applicable securities laws;

(g)     The Director and Officer Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein supra, the majority of the Board, including the Defendants listed below, are subject to the following prejudicial entanglements:

(1)     Defendants Kozel, Nuti and Bruno have all been affiliated and dealt with other during their various association with computer-systems

42

giant Cisco Systems, Inc.;

    (2)    Defendants Lawrie and Sameuk have each been affiliated with computer giant International Business Machines (I.B.M.);

    (3)    Defendant Yellin has been affiliated with the mega-firm of Skadden, Aarps, Slate, Maugher & Flom, LLP, which has represented both Yahoo and I.B.M., companies with significant ties to Directors Samenuk, Lawrie and Kozel.

    (4)    Defendant Lieb has been affiliated with Jones, Day, Reaves & Pogue, which has represented Cisco in various forms of litigation.

(h)    Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

(i)    The Director Defendants of Symbol, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(j)    In order to bring this suit, all of the directors of Symbol would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(k)    The acts complained of constitute violations of the fiduciary duties owed by Symbol's officers and directors and these acts are incapable of ratification;

(l)    Each of the Defendant Directors of Symbol authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and

43

which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(m)     Any suit by the current directors of Symbol to remedy these wrongs would likely expose the Defendants and Symbol to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(n)     Symbol has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Symbol any part of the damages Symbol suffered and will suffer thereby;

(o)     If the current Director Defendants were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand was futile; and

(p)     If Symbol's current and past officers and directors are protected against

44

personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Symbol. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Symbol against these Defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these Director Defendants were to sue themselves or certain of the officers of Symbol, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Symbol to sue them, since they will face a large uninsured liability.

## Claim For Relief

### Breach of Fiduciary Duty By Officer and Director Defendants

73     Plaintiff incorporates herein by reference all of the foregoing allegations as if fully set forth herein.

74     By reason of their positions and ability to control the business and corporate affairs of Symbol , at all relevant times, each Director and Officer Defendants owed Symbol and its shareholders fiduciary duties of loyalty, due care and full disclosure and was required to control Symbol in a fair, just and equitable manner and to act in furtherance of the best interest of Symbol

45

and its shareholders.

75     Each of the Officer Director Defendants also owed Symbol and its shareholders a fiduciary duty to exercise due care and diligence in the management and administration of the affairs of Symbol and in the use and preservation of its property and assets.

76     Each of the Officer and Director Defendants further owed Symbol and its shareholders a fiduciary duty to insure that Symbol operated in compliance with all applicable federal and state laws, rules and regulations, that Symbol did not engage in any unsafe or unsound practices, and that Symbol did not waste its corporate assets.

77     To discharge their fiduciary duties, each Director Defendant was required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Symbol. Among other things, each Director Defendant was required to:

a.     manage, conduct, supervise and direct the employees, business and affairs of Symbol in accordance with applicable laws, rules and regulations;

b.     not violate or permit any officer, director or employee of Symbol to violate applicable laws, rules and regulations;

c.     exercise reasonable control and supervision over Symbol's officers and employees;

d.     ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Symbol and its officers and employees;

e.     remain informed as to how Symbol was, in fact, operating, and, upon receiving notice or information of unsafe, imprudent or unsound practices, make reasonable investigation of such practices and take steps to correct such practices;

46

f.     supervise the preparation, filing and dissemination of any SEC filings, press releases, audits, reports or other information disseminated by Symbol;

g.     maintain and implement an adequate system of internal controls at Symbol, including financial, accounting and management information systems;

h.     supervise the preparation and filing of any audits, reports or other information disseminated by Symbol to make full and accurate disclosure of all material facts; and

i.     preserve and enhance Symbol's reputation as a global public corporation and maintain public trust and confidence in Symbol as a prudently managed institution fully capable of meeting its duties and obligations.

78     As described above, the Officer and Director Defendants maliciously, wantonly and willfully in bad faith intentionally breached their fiduciary duties to protect the rights and interests of Symbol and its shareholders.

79     As described above, the Director Defendants maliciously, wantonly and willfully in bad faith intentionally failed in their fiduciary duties to Symbol and its shareholders to prudently supervise, manage and control Symbol's operations and prudently manage the business and assets of Symbol.

80     By subjecting Symbol to the unreasonable risk of substantial losses by intentionally failing responsibly and with due care to oversee and implement proper accounting and public disclosure practices at Symbol, the Director Defendants maliciously, wantonly and willfully in bad faith intentionally breached their duties of good faith, due care and diligence in the management and administration of Symbol's affairs and in the use and preservation of Symbol's assets.

47

81     During the course of the discharge of their duties, the Director Defendants knew

the unreasonable risks associated with the wrongful conduct described in the complaint, and either

participated in or approved those activities or failed to supervise such activities in accordance with

their duties to both Symbol and its shareholders. As a result, the Director Defendants

intentionally grossly mismanaged or aided and abetted the gross mismanagement of Symbol and

its assets.

82     As a proximate result of the Officer and Director Defendants' intentional breaches

of fiduciary duties, Symbol has been damaged and will continue to suffer damages.

## DEMAND FOR JURY TRIAL

Plaintiff demand a trial by jury on all claims, issues or factual disputes subject to trial by

jury.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff demand judgment as follows:

A     A judgment finding that defendants have violated their fiduciary duties to the

Company and its shareholders and have wasted the Company's assets;

B.     A judgment against all defendants and in favor of the Company for the amount of

damages sustained by the Company as a result of the breaches of fiduciary duty by each

Director Defendant jointly and severally in an amount to be determined at trial, together

with prejudgment interest at the maximum rate allowable by law.

C.     An order awarding Plaintiff the costs and disbursements incurred in this action,

including reasonable allowances for Plaintiffs' attorneys' and experts' fees and expenses;

D.     An injunction requiring the Company to put into place and implement critical

controls and corporate therapeutics to not only prevent a recurrence of the wrongdoing alleged herein but to cause the Company to adhere to the highest standards of corporate governance.

E.      Granting such other or further relief as the Court may deem just and proper.

DATED: September 2⁰, 2005

BULL & LIFSHITZ, LLP

By: _____

Joshua M. Lifshitz (JL-9172)
Peter D. Bull (PB-9118)
18 East 41st Street
New York, New York 10017
Telephone (212) 213-6222

Attorneys for Plaintiff

49

## VERIFICATION

STATE OF NEW YORK  )
                              ) s.s.:

COUNTY OF KINGS  )

      Sam Wietschr being duly sworn, deposes and says:

      I am a Plaintiff in the above-entitled action, have read the foregoing Verified

Stockholder Derivative Complaint and know the contents thereof, and the same is

true to my own knowledge, except as to the matters therein stated to be alleged upon

information and belief, and as to those matters I believe them to be true.

Sworn to before me this
19ᵗʰ day of September 2005

Notary Public

JOSHUA M. LIFSHITZ
Notary Public, State of New York
No. 02LI5045729
Qualified in Nassau County
Commission Expires June 26, 2007